*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



## OPINION

No. 04-10-00015-CR

Michael A. **MIRANDA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 289th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-2903B
Honorable Carmen Kelsey, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
                Phylis J. Speedlin, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:  April 20, 2011

AFFIRMED

Michael A. Miranda was convicted of murder in a gang shooting, and sentenced to fifty

years' imprisonment.  On appeal, Miranda asserts that the evidence is insufficient to support the

jury's implicit rejection of his claim that he acted in self-defense or defense of a third person, and

that the court erred in admitting a witness's testimony that he was threatened.  We affirm the trial

court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of bad blood between two gangs, the West Park Thugs (WPT) and A2K,[1] which led to the shooting death of Joey Mermella, who was 18 years old. Mermella was a former WPT member who had switched his allegiance to the A2K gang. Appellant Michael Miranda and his older brother Juan Miranda were members of WPT. Mermella remained friendly with Juan Miranda, but had a conflict with Michael Miranda which arose out of Michael fighting with two of Mermella's fellow A2K members over a girl. During the month preceding the fatal shooting, Mermella called Juan Miranda at least twice and told him if Michael did not cool off, "one of us is going to get killed."

At approximately 3:00 p.m. on September 21, 2006, Mermella and his girlfriend Nancy Camarillo and their baby drove past 350 Estrella in a black Toyota on their way to the home of Eric Vasquez, a fellow A2K member. A group of male teenagers standing outside the house made gang signs, yelled out, and threw cans and bottles at Mermella as he drove past. According to Camarillo, Mermella just laughed and called them kids. During the afternoon, Mermella consumed several beers, heroin, and a Xanax tablet in anticipation of getting a tattoo at a friend's house. According to his girlfriend, Mermella was so intoxicated that he was stumbling when they left the friend's house at about 9:30 p.m.; she also stated that Xanax makes Mermella violent. When they drove past 350 Estrella on the way back to the Vasquez house, only one young man was outside and he yelled obscenities and threw gang signs at them; Mermella stuck his upper body out the passenger window and yelled obscenities and made gang signs back. When they got back to Eric Vasquez's house, Mermella said he wanted to go back to fight the

---

[1] A2K is an acronym for, alternatively, "All 2 Kute," "Authorized 2 Kill," and "Addicted 2 Kronik." Kronik is a slang term for marihuana.

guy "one on one." Mermella tried to convince the other A2Ks at the house to go with him, but no one wanted to risk getting arrested.

Camarillo stated that Mermella did not have a gun or any other weapon with him that night. According to Alex Vasquez, an A2K present at Eric Vasquez's house that night, he was certain Mermella did not have a gun with him when he went back to 350 Estrella, even though they all knew the WPTs had a rifle at that house. Alex testified that Mermella "had so much hate for these people, he would [have] been the first one to shoot," or he would have done a drive-by, if he had a gun that night. Alex confirmed that Mermella was on parole from Texas Youth Commission (TYC) for carrying a gun, and "was known for that." Approximately two months before September 21, 2006, Mermella had shot at a young man at a bus stop, but did not try to hit him. Alex last saw Mermella with a gun about one month prior to September 21 when he had a .357 handgun, which he sold a few days later.

Mermella decided to walk back to 350 Estrella by himself to confront the WPT member who had cursed at him. As he walked down the street, Mermella took off his shirt and threw it down which is a signal that there is going to be a fight. Mermella stopped in the street in front of 350 Estrella, yelling and cursing at the group of young men standing in the front yard inside the chain link fence, and calling them to come outside the fence. There were four young men inside the fenced front yard at 350 Estrella when Mermella walked up: Michael Miranda and his younger brother Jonathan, John Garza, and Leonard Elizardo.

Leonard Elizardo, a 16 year-old member of the Aztec Mob gang, stated that Michael and Jonathan Miranda arrived at John Garza's house at 350 Estrella on the night of September 21, 2006 after dark. They were all hanging out with John Garza in the front yard when a Toyota drove by and a man yelled out obscenities and made A2K gang signs. After that, John Garza

brought two guns out to the front yard, a shotgun and a .22 caliber handgun. Elizardo thought the guns were for protection because the A2Ks had fired shots at the house and broken a window the weekend before. The .22 handgun was passed around and then both guns were laid down on the ground. After about five minutes, a young man, later determined to be Mermella, came walking down the street and stopped in front of 350 Estrella, yelling, "Big time A2K," and taunting them to come outside the fence. When Mermella walked up yelling and shouting, the four young men ran over to the side fence to see what was going on. Michael Miranda took the .22 handgun and stood near the fence about 30 feet away from Mermella; Jonathan stood behind his brother Michael; Elizardo stood further back by a big tree; John Garza ran to the backyard with the shotgun. Michael fired several shots at Mermella. Elizardo did not know whether he fired up in the air, down, or at Mermella. Mermella kept talking trash, saying, "Come on, is that all you got? Come out of the fence." Elizardo testified Mermella had one hand behind his back the whole time "acting like he had a gun." However, Elizardo never saw a gun on Mermella or heard any shots come from him; he remembered John Garza telling him that Mermella did have a gun. Elizardo testified that if Mermella had pulled a gun, all three of them were within gunshot range with no obstructions to shield them. After Michael Miranda fired several shots with the .22 and Mermella kept talking, John Garza came out from the backyard saying, "Don't be disrespecting my canton," i.e., district, and fired one shot from the shotgun at Mermella, who flinched and ran off down the street. The four young men got in Miranda's van and drove off right after the shooting. They drove to Elizardo's friend's house where they left the guns. When the paramedics arrived at the scene, Mermella was still breathing but died in the ambulance. He had a shotgun wound to the chest.

Michael Miranda and John Garza were both indicted for the murder of Mermella; separate trials were conducted. Miranda, 15 years old at the time of the shooting, was certified to be tried as an adult. At trial, Miranda claimed he acted in self-defense, and in defense of his 14 year-old brother Jonathan, when he shot at Mermella. Miranda testified that on the evening of September 21, 2006, he and Jonathan were hanging out in the front yard at 350 Estrella when Mermella's black car passed by. The first time, nothing happened, but when it passed the second time there was yelling and cursing between the gangs. At about 10:00 or 10:30 p.m., Miranda was going into the house to get water when he heard someone outside yelling, "Big time A2K." When Miranda came outside he saw Mermella in the street, with one hand behind his back, yelling at Jonathan and Elizardo to come out of the yard; Miranda walked out and stood next to Jonathan near the fence. Elizardo was holding a .22 caliber handgun which belonged to Elizardo; he was pointing it at Mermella. Miranda did not see John Garza at the time. Miranda testified that, knowing the kind of person Mermella was based on his prior experiences with him, he knew "something was going to happen." Miranda was scared because his younger brother Jonathan and John Garza's family were there at the house. Because Elizardo was shaking and not holding the .22 steady, Miranda was worried that Elizardo would not shoot and defend them even if Mermella shot at them. When Miranda saw Mermella again reach back with one hand (he had brought both hands out in front at one point), and his brother Jonathan duck, Miranda grabbed the .22 from Elizardo to defend himself and Jonathan, as well as the people inside the house. Miranda testified, "Not only did I fear for my life for what he was going to do, knowing Joey, my brother, too . . . Not only protecting myself for what Joey was capable of doing and knowing Joey at that point, protecting myself, my little brother and the people inside the house. Because knowing Joey, Joey was the type that he didn't care whether he shoot the house and hits

anybody." Miranda stated he saw a gun in Mermella's hand, but could not tell what type of gun it was because he was not close to the street light. Miranda admitted firing three or four rounds with the .22 handgun at Mermella. When asked whether he could have safely retreated, Miranda testified, "No. Knowing Joey, . . . the way Joey was, I knew I couldn't back off. I either had to be—either had to be me, or him." Miranda did not know where John Garza was until he heard a shot fired from the shotgun; he turned and saw Garza standing at the back corner of the house. Miranda did not know whether Mermella was hit, but Mermella turned and ran down the street. Miranda stated that right after the shooting he felt scared and nervous because he had never been in a situation like that; but, he felt that "if I wouldn't have reacted, it probably would have been me laying down." Miranda said he handed the .22 back to Elizardo, who suggested they leave before the police showed up. Elizardo directed them to drive to Matthew Valdez's house where they left the guns. Miranda learned on the evening news that Mermella had died.

With respect to his own state of mind that night, Miranda testified he was aware that Mermella had a history of violence and shootings, and was on parole from TYC for a weapons charge. Miranda had personally witnessed Mermella shoot at a member of the Kings gang waiting at a bus stop with his girlfriend and baby in a stroller; he also witnessed Mermella do a walk-by shooting at another King's house with a 9 millimeter gun, and point his gun at members of his own gang for "disrespecting." Miranda described Mermella as a "hard core" guy who would not listen to reason and always wanted to start trouble. There had been a recent difficulty between Mermella and Michael Miranda which started a few months before the shooting when Michael talked to Alex Vasquez's girlfriend and got in fights with several A2Ks; Mermella had made threats toward Michael and Jonathan Miranda within the month prior to the shooting, telling their older brother Juan Miranda that "one of us is going to end up getting killed." In

addition, about one week before the shooting, a car full of A2Ks threw bottles and shot in the air when Miranda and other WPTs were outside at 350 Estrella. At trial, the State presented evidence that Miranda went into hiding after the shooting, and when officers arrived to arrest him Miranda tried to flee. The State also submitted a MySpace photograph of Michael Miranda posing with a .45 handgun and clip that was taken shortly after the shooting.

The physical evidence collected from 350 Estrella consisted of a .22 caliber magazine with four live cartridges found in a trash can on the front porch; four live .22 caliber bullets found in John Garza's bedroom; some spent and live shotgun shells, some with BB's and some with slugs, found in his brother William's bedroom; and four .22 caliber shell casings and two spent shotgun shells collected from the street. The 12-gauge shotgun and shells used in the shooting were recovered from the residence of Matthew Valdez, who testified that Elizardo came by in a van on the night of September 21, 2006 with Michael Miranda and John Garza, who asked him to alter and hide the shotgun; Valdez noticed a strong odor of gunpowder, indicating the shotgun had recently been fired. No gun or other weapon was found on or near Mermella's body when officers arrived at the scene. The autopsy of Mermella showed his front torso and left arm had multiple pinpoint holes associated with shotgun pellets; 45 lead pellets were recovered. The pathologist opined there were two shotgun wounds which could have been caused by one shotgun blast fired from at least ten feet away. There was no evidence that Mermella was hit by a .22 caliber bullet. His toxicology results showed a blood alcohol content of 0.22, plus the presence of heroin breakdown products and morphine. Mermella's cause of death was a shotgun wound to the chest and abdomen, which fatally damaged his vital organs and caused him to bleed to death internally.

The jury charge contained instructions on liability as a party, and on the defensive issues of self-defense, use of deadly force, defense of a third person, and apparent danger. The jury implicitly rejected Miranda's claims of self-defense and defense of another, and found him guilty of murder. The court adopted the jury's recommendation and sentenced Miranda to fifty years' imprisonment. Miranda obtained an out-of-time appeal which we now address.

### SELF DEFENSE AND DEFENSE OF THIRD PERSON

On appeal, Miranda asserts the evidence is insufficient to support the jury's implicit rejection of his claim that he acted in self-defense or in defense of another. The State responds that it proved all the elements of murder beyond a reasonable doubt, and the jury was entitled to disbelieve Miranda's testimony that he acted defensively.

*Applicable Law*

Under section 9.31(a) of the Texas Penal Code, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West Supp. 2010).[2] If a person would be justified in using force under section 9.31, he may use deadly force when and to the degree he reasonably believes it is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force, but only if a reasonable person in the actor's situation would not have retreated. TEX. PENAL CODE ANN. § 9.32(a) (West 2003).[3] In addition, the Penal Code permits a

---

[2] Section 9.31(a) was amended after the date of commission of the offense in this case, but the provision quoted was not substantively changed; therefore, we cite to the current version of the statute in this instance. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, 2007 Tex. Gen. Laws 1 (current version at TEX. PENAL CODE ANN. § 9.31(a) (West Supp. 2010)).

[3] Section 9.32(a) was amended effective September 1, 2007, and, in relevant part, deleted the duty to retreat. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, 2007 Tex. Gen. Laws 1 (current version at TEX. PENAL CODE ANN. § 9.32(a) (West Supp. 2010)). Because Miranda's offense was committed before the effective date of the 2007 amendment, however, this case is governed by the version of section 9.32(1) that was in effect at the time of the

person to use force or deadly force in order to protect a third person if: (1) under the circumstances as he reasonably believes them to be, he would be justified in using such force to protect himself against the unlawful force or deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) he reasonably believes his intervention is immediately necessary to protect the third person. TEX. PENAL CODE ANN. § 9.33 (West 2003).

Once a defendant produces some evidence raising the issue of self-defense or defense of a third person, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). To meet its burden of persuasion, the State is not required to produce additional evidence. *Saxton*, 804 S.W.2d at 913. If the jury finds the defendant guilty, it has made an implicit finding against any defensive theory raised by the defendant. *Id.* at 914; *Zuliani*, 97 S.W.3d at 594.

Miranda asserts the evidence is both legally and factually insufficient to support the jury's rejection of his claims of self-defense and defense of a third person. In view of the Court of Criminal Appeals' recent holding in *Brooks v. State* that there is no meaningful distinction between the standards for legal and factual sufficiency review, we will review the evidence only for legal sufficiency. *See Brooks v. State*, 323 S.W.3d 893, 895, 902 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), and holding the *Jackson v. Virginia,* 443 U.S. 307 (1979), legal-sufficiency standard is the only standard to be applied in determining whether the evidence is sufficient to support a finding of each element of a criminal offense beyond a reasonable doubt). When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, "we look not to

_____

commission of the offense. *See id.* Act of March 20, 2007, 80th Leg., R.S., ch. 1 § 5(a), 2007 Tex. Gen. Laws 1 (current version at TEX. PENAL CODE ANN. § 9.32(a) (West Supp. 2010)).

whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (legal sufficiency review involves consideration of all the evidence and reasonable inferences viewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt); *see also Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899.

### *Review of the Evidence*

Miranda was indicted for committing murder by intentionally and knowingly causing the death of Joey Mermella by shooting him with a deadly weapon, to wit: a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003). The jury was instructed to find Miranda guilty of murder if they found beyond a reasonable doubt that Miranda engaged in such conduct, either acting alone or together with another as a party. *See* TEX. PENAL CODE ANN. § 7.01(a) (West 2003) (providing that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible); *Id.* § 7.02(a)(2) (West 2003) (a person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense").

The charge also instructed the jury to acquit Miranda of murder if it found, or had a reasonable doubt, that he acted in self-defense or defense of his brother Jonathan.

Miranda contends the evidence is legally insufficient to support the jury's implicit rejection of his claims of self-defense and defense of a third person because he testified that he saw Mermella draw a gun, and he reasonably believed Mermella would shoot it at them; therefore, no rational jury could have found he did not act in self-defense or in defense of his brother. Miranda stresses that the reasonableness of his belief that deadly force was being exerted against him, and thus was necessary in return, must be judged from his standpoint at the time he acted. *See Bennett v. State*, 726 S.W.2d 32, 37–38 (Tex. Crim. App. 1986). He emphasizes his testimony that: he observed Mermella reach back and start to draw a gun before he admittedly fired four rounds at Mermella; he then saw that Mermella had drawn a gun, although he could not tell what type of gun; and he believed he could not safely retreat and that Mermella would shoot at him and his brother, as well as the Garza family's house, based on his knowledge of Mermella's character and prior actions, including unprovoked shootings, and Mermella's prior verbal threats against him and Jonathan.

Self-defense and defense of a third person are issues of fact for the jury to determine. *Saxton*, 804 S.W.2d at 914; *Vasquez v. State*, 2 S.W.3d 355, 358 (Tex. App.—San Antonio 1999, pet. ref'd). The jury heard the evidence of Mermella's violent nature and his prior verbal threats against Miranda and his brother. *See Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002) (homicide defendant raising self-defense may introduce evidence of decedent's violent character). However, Mermella's verbal taunting on the night of September 21, 2006 did not by itself justify Miranda's use of force against him. *See* TEX. PENAL CODE ANN. § 9.31(b)(1) (verbal provocation alone does not justify use of force). The jury had to find that Miranda

reasonably believed, or it reasonably appeared to him, that it was immediately necessary for him to use deadly force to protect himself against Mermella's use or attempted use of deadly force, and a reasonable person would not have retreated, at the moment that he fired at Mermella. *Id.* § 9.32(a); *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996) (person has the right to defend himself against apparent danger to the same extent as he would if the danger was actual).

A rational fact finder could choose to disbelieve Miranda's testimony that it reasonably appeared to him, and he reasonably believed, that Mermella had a gun that night and that deadly force was immediately necessary to protect himself and his brother against Mermella's attempted use of deadly force, or that a reasonable person in that situation would not have retreated; accordingly, a reasonable fact finder could find beyond a reasonable doubt that Miranda did not act in self-defense or defense of his brother when he shot at Mermella four times. *See Vasquez*, 2 S.W.3d at 358; *see also Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); *Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). As previously detailed, *supra*, the only evidence that Mermella had a gun that night came from Miranda's testimony. The testimony by multiple witnesses that Mermella did not have a gun, and the fact that no gun was found on or near Mermella, could have influenced the jury to disbelieve Miranda's testimony that he reasonably perceived an apparent danger that Mermella had a gun and would use it. Further, the approximate 30-foot distance between Mermella in the street and Miranda and the others inside the fenced yard, with a nearby house they could run inside, could have caused the jury to conclude a reasonable person would have retreated. Viewing the evidence under the appropriate standard, and deferring to the jury's resolution of issues of credibility and conflicts in the evidence, we conclude the evidence is legally sufficient to support the jury's rejection of Miranda's claims of self-defense and defense of a third person. *See Brooks*, 323 S.W.3d at 899.

**EVIDENTIARY ISSUE**

Finally, Miranda asserts the trial court abused its discretion in permitting a witness to testify that he was threatened the day after the murder. Miranda contends the probative value of the testimony was substantially outweighed by the danger of unfair prejudice, and therefore the evidence should have been excluded under Rule 403. TEX. R. EVID. 403. A trial court's ruling on the admissibility of evidence under Rule 403 is reviewed under the abuse of discretion standard. *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005) (test is whether trial court's action was arbitrary or unreasonable, and falls outside zone of reasonable disagreement). In resolving a Rule 403 challenge, the court considers the following nonexclusive factors to determine whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Id.* at 440; *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1990). We must determine whether the trial court's ruling was reasonable in view of all the relevant facts. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). It is only when there is a "clear disparity" between the degree of prejudice and the probative value of the evidence that exclusion is appropriate under Rule 403. *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992); *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993) ("unfair prejudice" under Rule 403 refers to "an undue tendency to suggest decision on an improper basis").

At trial, Ralph Castillo, a neighbor who lived across the street from 350 Estrella, testified that he heard two shots from a small gun and then a much louder "big shot" around 10:30 or 11:00 p.m. on September 21, 2006. He looked out the window and saw a young man wearing

jeans and a white shirt walking down the street. Two or three other boys were in the dark near a tree inside the fenced front yard of 350 Estrella. Castillo then saw another young man carrying a long-barreled shotgun walking on the sidewalk outside the fence; he was also wearing blue jeans and a white T-shirt. An older man ran up to him and grabbed the shotgun away. The boys all ran inside the house; a short time later, everyone got into a van and drove off. Castillo also testified that about one week before the shooting a dark colored car stopped in front of 350 Estrella and someone fired three or four gunshots into the air causing all the young men out front to run inside. Castillo had discussed moving away with his girlfriend after that incident. Over objection, Castillo was allowed to testify that after the shooting some unknown people came to his house and he felt threatened; he ended up moving two or three weeks later. When asked whether the threat was from "Laemma [sic]," Castillo said "yeah," but when asked if he knew what that word meant, he said "no."[4]

On appeal, Miranda concedes there was substantial testimony about gang membership during his trial, but argues the reference to a threat against Castillo by the "Mexican Mafia" was unduly prejudicial and constitutes harmful error. With respect to the degree of probative value, there was no testimony connecting the unidentified people who made the threat to Miranda or the Miranda family, or to his gang WPT; it was equally likely the threat was made on behalf of John Garza, the person whose shot actually killed Mermella. The evidence that Castillo was threatened by unknown persons with no proven connection to Miranda had minimal capacity to make a fact of consequence more or less probable. *See Mechler*, 153 S.W.3d at 440 (first factor

---

[4] The Spanish term "La Eme" is used to refer to the Mexican Mafia. *See Saenz v. State*, 131 S.W.3d 43, 45 n.1 (Tex. App.—San Antonio 2003), *aff'd*, 166 S.W.3d 270 (Tex. Crim. App. 2005); *see also United States v. Valles*, 484 F.3d 745, 747 (5th Cir. 2007) (detailing the history and organization of the Texas Mexican Mafia, and noting it is officially named "Mexikanemi," which is Spanish for "free-Mexicans," and is often referred to as "La Eme," a phonetic reference to Mexikanemi).

asks how compellingly the evidence serves to make a fact of consequence more or less probable).  At most, it could support an inference that Miranda was conscious of his guilt.

Second, as to the evidence's potential to create an irrational impression with the jury, Miranda asserts the reference to the Mexican Mafia potentially caused the jury to convict him based on a tenuous connection to the Mexican Mafia, a national criminal organization.  However, the term "Mexican Mafia" was not used during Castillo's testimony in the jury's presence; the jury heard only a reference to "La Eme," and Castillo stated he did not know what the word meant.  Therefore, the Spanish term "La Eme" by itself with no explanation had little potential to impress the jury in an irrational way.  Moreover, the State used the term "Mexican Mafia" with a different witness, Leonard Elizardo, in the context of whether he was afraid of retaliation, with no objection by the defense.  In addition, there was other testimony during trial about threats of retaliation against testifying witnesses.  Elizardo testified that he believed he could die for testifying against Miranda, and one of the police officers from the neighborhood testified he was aware there was a "hit" out on Elizardo for testifying; in fact, Elizardo refused to testify while the cameras were inside the courtroom.  In addition, Alex Vasquez, an A2K member who testified against Miranda, stated that he wanted his mother to move because he was afraid the Miranda family would do something to his family or house.  Vasquez testified that someone driving a blue PT Cruiser had shot at his house and his sister's car; also, a red Mustang had been repeatedly driving past his house and someone from the car threw a brick at his mother's car.  Vasquez stated he knew the Miranda family drove a red Mustang and a blue PT Cruiser.

Finally, with respect to the third and fourth factors, the time required for the State to develop the evidence was minimal in the context of the entire trial and the State had little need

for the evidence to prove up the charge against Miranda.  Even if admission of the evidence was error, however, we conclude any error did not affect Miranda's substantial rights.  *See* TEX. R. APP. P. 44.2(b); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).  Viewed in the context of the entire trial, which was permeated by evidence of gang memberships, gang nicknames, signals and terms, and other threats of retaliation, the isolated unexplained reference in Spanish to "La Eme" during Castillo's testimony was harmless error.

## CONCLUSION

Based on the foregoing reasons, we overrule all of Miranda's issues on appeal and affirm the trial court's judgment.

Phylis J. Speedlin, Justice

PUBLISH