ACCEPTED
04-15-00278-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
10/9/2015 8:28:50 AM
KEITH HOTTLE
CLERK

NO. 04-15-00278-CR

IN THE COURT OF APPEALS

FOR THE

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
10/09/15 8:28:50 AM
KEITH E. HOTTLE
Clerk

FOURTH COURT OF APPEALS DISTRICT

OF TEXAS

SAN ANTONIO, TEXAS


SIDNEY R. DENBINA,
**Appellant**

VS.

THE STATE OF TEXAS,
**Appellee**

**Trial Cause No. 2014-CR-8319
Appeal from the 187th District Court
Bexar County, Texas
Hon. Steven C. Hilbig, Presiding**


BRIEF FOR APPELLANT


**MICHAEL D. ROBBINS
Assistant Public Defender
Paul Elizondo Tower
101 W. Nueva St., Suite 370
San Antonio, Texas 78205
(210) 335-0701
FAX (210) 335-0707
mrobbins@bexar.org
Bar No. 16984600**

**ORAL ARGUMENT
NOT REQUESTED**

**ATTORNEY FOR
APPELLANT**

i

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a) (West 2015), the parties to this suit are as follows:

(1)    **SIDNEY R. DENBINA**, TDCJ #01999733, Daniel Unit, 938 South F.M. 1673, Snyder, Texas 79549, is the appellant and was the defendant in trial court.

(2)    The **STATE OF TEXAS**, by and through the Bexar County District Attorney's Office, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205, is the appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1)    Sidney R. Denbina was represented by **JUAN P. AGUILERA,** 111 Soledad St., Suite 315, San Antonio, Texas 78205.

(2)    The State of Texas was represented by **NICHOLAS LAHOOD,** District Attorney, and **CARRIE MOY** and **MARILISA JANSSEN,** Assistant District Attorneys, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205.

The appellate attorneys are as follows:

(1)    Sidney R. Denbina is represented by **MICHAEL D. ROBBINS**, Assistant Public Defender, Paul Elizondo Tower, 101 W. Nueva St., Suite 370, San Antonio, Texas 78205.

(2)    The State of Texas is represented by the **BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE**, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205.

The trial judge was **HON. STEVEN C. HILBIG,** 187th District Court, Cadena-Reeves Justice Center, 300 Dolorosa St., 2nd Floor, San Antonio, Texas 78205.

# Table of Contents

                                                                                                    Page

Identity of Parties and Counsel  .        .        .        .        .        .        .        .        ii

Table of Contents  .        .        .        .        .        .        .        .        .        .        iv

Table of Authorities        .        .        .        .        .        .        .        .        .        v

A Note Regarding Record References  .        .        .        .        .        .        .        vii

Statement Regarding Oral Argument  .        .        .        .        .        .        .        vii

Statement of the Case        .        .        .        .        .        .        .        .        .        1

Issue Presented        .        .        .        .        .        .        .        .        .        2

### APPELLANT'S POINT OF ERROR
The evidence was legally insufficient to support the jury's implicit rejection of Sidney R. Denbina's claim that he acted in self-defense.

Statement of Facts .        .        .        .        .        .        .        .        .        .        3

Summary of the Argument        .        .        .        .        .        .        .        .        18

Argument        .        .        .        .        .        .        .        .        .        .        19

        Appellant's Point of Error (Restated)  .        .        .        .        .        .        19

Conclusion and Prayer        .        .        .        .        .        .        .        .        .        25

Word Count Certificate of Compliance        .        .        .        .        .        .        26

Certificate of Service.        .        .        .        .        .        .        .        .        26

# Table of Authorities

Page

### Constitution

U.S. CONST. amend. V . . . . . . . . . 13

U.S. CONST. amend. XIV . . . . . . . . . 20

### Statutes

TEX. PENAL CODE § 1.07 (West 2011) . . . . . . .16.24

TEX. PENAL CODE § 2.03 (West 2011) . . . . . . . 20

TEX. PENAL CODE § 9.31 (West 2011) . . . . . . .19,23

TEX. PENAL CODE § 9.32 (West 2011) . . . . . . 19,20,23

TEX. PENAL CODE § 22.01 (West 2011) . . . . . . 1

### Rules

TEX. R. APP. P. 9.4 (West 2015) . . . . . . . . 26

TEX. R. APP. P. 38.1 (West 2015) . . . . . . . ii

TEX. R. APP. P. 44.2 (West 2015) . . . . . . . 24

### Cases

*Brooks v. State*, 323 S.W.2d 893 (Tex. Crim. App. 2010) . . . .20,21

*Conner v. State*, 67 S.W.3d 192 (Tex. Crim. App. 2001) . . . . 20

*Flanagan v. State*, 675 S.W.2d 734 (Tex. Crim. App. 1984)(op. on reh'g) . 21

*Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001) . . . . 24

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . 20

*Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996) . . . . 11

*Miranda v. State*, 350 S.W.3d 141 (Tex. App. – San Antonio 2011, no pet.) . 21

*Rankin v. State*, 46 S.W.3d 899 (Tex. Crim. App. 2001) . . . . 19

*Saxton v. State*, 804 S.W.2d 910 (Tex. Crim. App. 1991) . . . 20,21,24

*Stogeria v. State*, 191 S.W.3d 194 (Tex. App. – San Antonio 2005, no pet.) . 21

## A Note Regarding Record References

There are seven volumes in the reporter's record of the trial. In this brief, references to these volumes will be thus: (RR 1, ___). The record also contains two volumes of hearings in the Magistrate's Court, relating to mental health issues. These present nothing for appellate review, and will not be referenced in this brief. References to the clerk's record will be thus: (CR, ___). The names of the testifying witnesses will appear in **bold type** at the beginning of the summary of their testimony.

## Statement Regarding Oral Argument

The issue raised in this appeal may be determined from the record and legal authorities alone. For that reason, the undersigned counsel does not request oral argument, but will present oral argument if it is requested by the State and granted by the Court.

TO THE COURT OF APPEALS FOR THE FOURTH COURT OF APPEALS DISTRICT OF TEXAS:

This brief is filed on behalf of Appellant, Sidney R. Denbina, by Michael D. Robbins, Assistant Public Defender.

## Statement of the Case

Appellant Sidney R. Denbina was charged by indictment with the offense of aggravated assault with a deadly weapon.[1] (CR, 6). A jury was sworn (RR 2, 96), and Mr. Denbina pleaded not guilty. (RR 3, 18). Following evidence and arguments of counsel, the jury found Mr. Denbina guilty of aggravated assault with a deadly weapon. (CR, 83; RR 5, 17). Mr. Denbina elected that the court assess punishment in case of conviction. (CR, 70). The court assessed a sentence of 15 years' confinement, with no fine. (CR, 104 – 105; RR 6, 31). The court certified that this is not a plea bargained case and that Mr. Denbina has the right of appeal. (CR, 106). Mr. Denbina timely filed a notice of appeal. (CR, 103). This appeal follows.

---

[1] A felony of the second degree, in violation of TEX. PENAL CODE §§ 22.01(a)(2) & (b) (West 2011). The indictment also contained a count alleging attempted murder, and a second paragraph in the aggravated assault count, but these were waived by the State. (RR 2, 6).

## Issue Presented

## Appellant's Point of Error

The evidence was legally insufficient to support the jury's implicit rejection of Sidney R. Denbina's claim that he acted in self-defense.

## Statement of Facts[2]

**Gunshots fired in a quiet neighborhood.**

**Rene David Hernandez** was 20 years old on April 30, 2014, and resided at 10318 Shady Meadows. (RR 3, 29). Sidney R. Denbina and Uvaldo Siller were his neighbors. (RR 3, 29-30). On the night of that April 30, Rene was at home with his parents, Richard and Maria Hernandez. Rene Hernandez had been outside with his father, but went into the house. (RR 3, 30-31). He was in the restroom when he heard eight gunshots.[3] He went to a window and looked out. (RR 3, 31). He saw Mr. Siller lying on the ground. Rene and his father ran outside to see what happened. Mr. Siller lived next-door to the Hernandez family, and Mr. Denbina lived across the street from Mr. Siller. (RR 3, 32).

Mr. Denbina mostly kept to himself, so Rene Hernandez had no personal relationship with him. Rene and his father went to Mr. Siller and tried to calm him down. Mr. Siller's mother and Rene Hernandez's mother both came out of their respective houses, both agitated, and Rene tried to calm them down. (RR 3, 33). It was obvious that Mr. Siller had been shot. He was in pain and was losing consciousness. (RR 3, 34-35). Mr. Siller said that the neighbor across the street came up and shot him. He did not say who it was, but he pointed toward Mr.

---

[2] This brief will summarize the testimony as given at trial. Appellant does not concede that the State's evidence is true.

[3] There was a short pause after the first shot, and then there were seven more shots.

3

Denbina's house. Rene's mother called 9-1-1 (RR 3, 36). Rene thought that Mr. Denbina might still be inside his house, because the door was cracked open. The police arrived a few minutes later, and made everyone get out of the line of fire. (RR 3, 36).

**Richard Rene Hernandez, Sr. ("Rick")** was Rene's father. He was friendly with Mr. Siller, but he never communicated with Mr. Denbina. (RR 3 57-58). On the day in question, Rick Hernandez was home all day. He did not see Mr. Denbina until after dark, when he went outside to speak with another neighbor, Rudy Lopez. Rick Hernandez saw Mr. Denbina out in his own yard by a tree. (RR 3, 59). Mr. Denbina was in his yard just looking around. Mr. Siller had not returned from work at that time. After visiting with Mr. Lopez for about 45 minutes to an hour, the Hernandez family went back home and went inside their house. (RR 3, 60).

Rick was in his living room watching a Spurs game when he heard gunshots from nearby. (RR 3, 61). His son Rene ran to a window and said that Mr. Siller had been shot. They ran outside and found Mr. Siller on the ground. He was bleeding and in pain. There was blood on the ground. Mr. Siller was on the ground beside his truck. (RR 3, 62). The door was still open, and it appeared that Mr. Siller had gotten out of the truck. He said that Mr. Denbina shot him and ran back to his house. (RR 3, 63). Rick Hernandez's wife called 9-1-1. Rick stood on the sidewalk by Mr. Siller's house and yelled at Mr. Denbina, sort of daring him to come out.

4

Mr. Denbina did not come out, but his front door was ajar. When the police arrived, they told everyone to go inside the Siller home. (RR 3, 64).

Rick Hernandez told the police what he had seen and heard. He did not see Mr. Siller being taken away in an ambulance. (RR 3, 65). The Hernandez family was not allowed to go back to their own house until hours later, around 3:00 or 4:00 the next morning. Rick Hernandez did not see any weapons on the ground near Mr. Siller. He could see inside Mr. Siller's truck and did not see any weapons there, either. (RR 3, 66). There were creek beds behind the houses on both sides of Shady Meadows. If you jumped a fence, you could get to a creek bed and go down it to a street. It would have been possible for Mr. Denbina to go out of his back yard and leave the area. (RR 3, 67).

**Angela Bruce** lived at 10327 Shady Meadows. On the evening in question, she was at her home with her boyfriend and another friend. (RR 3, 89). She and her friend were in her front yard at about 9:30 P.M. when she heard gunshots. She saw Mr. Denbina across the street. (RR 3, 89-90). He was standing behind his Jeep. Ms. Bruce's house was next-door to Mr. Siller's and across the street and a bit down from Mr. Denbina's. Mr. Denbina was pacing back and forth. (RR 3, 91). He had something dark in his hand, like a cell phone. He was wearing a white shirt and was leaning on the hood of his Jeep. (RR 3, 92). Mr. Siller had backed his own

truck into his driveway and the door was open. Mr. Denbina was standing on the far side of his Jeep. (RR 3, 94).

Ms. Bruce saw Mr. Siller backing into his driveway. He did not yell anything, and neither did Mr. Denbina. This was a minute or two before the gunshots. Ms. Bruce saw a flash of light from the gunshot coming from the direction of Mr. Denbina's Jeep. (RR 3, 96). Ms. Bruce heard four gunshots before going inside her house. (RR 3, 96-97). She called 9-1-1. She looked out her window and saw Mr. Siller on the sidewalk. (RR 3, 97). She did not see any weapons around him. She did not see Mr. Denbina at that time, but she could hear Mr. Siller yelling in pain. She was a nurse and could see that Mr. Siller was injured. (RR 3, 98). The neighbor across the street – Rick Hernandez – was shouting at Mr. Denbina to come out of his house. Ms. Bruce stayed inside. (RR 3, 99-100). When the police arrived, they told her to go to another area of her house, outside the line of fire. (RR 3, 100).

**The police testimony.**

**Fernando Luna** was a patrol officer with the Bexar County Sheriff's Office ("BCSO"). (RR 3, 112). He was assigned to the Street Crimes Unit, also known as the SWAT Team. On April 30, 2014, he was assigned to the west and northwest side of the county. He was alone in his patrol car, but fellow officers in the unit were nearby. (RR 3, 113). He heard an emergency signal for the shooting when he

was just a few blocks away from Shady Meadows. (RR 3, 114). He responded to the signal and arrived at the scene within two minutes. He was the first officer to arrive.[4] The complainant – Mr. Siller – was lying on the ground covered with blood. The complainant said he had been shot by a corrections officer who worked at the Fabian Dominguez Unit, and he pointed across the street. (RR 3, 115). Deputy Luna believed that the shooter was still inside the house. The scene was not yet secured, and the deputy knew the Acadian Ambulance could not come to the house. He asked the ambulance driver to park down the street and have a stretcher ready. The deputy and other responding officers placed the complainant on the stretcher and brought him to the ambulance. (RR 3, 116).

The ambulance crew loaded Mr. Siller into the ambulance and took him away. There were shell casings on the ground beside Mr. Siller. (RR 3, 117). The complainant was beside a red pickup truck with the door open. (RR 3, 117-118). He was in pain. The BCSO sergeant and lieutenant arrived and instructed the SWAT officers to set up a perimeter. Sheriff's Office personnel were going to get a search warrant for Mr. Denbina's house. (RR 3, 118).

From the shell casings on the ground, officers knew that the weapon was a handgun. The whole SWAT team arrived within minutes of the first call. (RR 4, 5). It took three hours before the warrant was issued and the team could enter Mr.

---

[4] This occurred a few minutes after 10:00 P.M. (RR 4, 12).

7

Denbina's house. (RR 4, 7). The door was closed by that time. They rammed the front door with a breacher to gain entry. Eight or 10 officers entered the house. (RR 4, 8). Deputy Luna noticed a rifle leaning against the wall right after he entered the house. There was another rifle on the ground. (RR 4, 9). There was a lot of ammunition in the house and garage. There were also tools used to make home-made ammunition. Deputy Luna did not see Mr. Denbina inside the house. (RR 4, 10).

**Calvin Anderson** was a deputy and crime scene technician with BCSO. (RR 4, 20). He was dispatched to Shady Meadows at 10:10 P.M. on the night of the shooting. Mr. Siller had already been taken away by the time Deputy Anderson arrived. (RR 4, 21). Deputy Anderson's job was to take photos and collect physical evidence. (RR 4, 23). Fifty-seven of his photos were admitted into evidence. (RR 4, 24; RR 7, SX6 – SX62). Deputy Anderson located eight shell casings in the vicinity of where Mr. Siller was shot. (RR 4, 29). The shell casings were .45 caliber. There were boxes of ammunition inside Mr. Denbina's house. (RR 3, 32). Deputy Anderson found a box of .45 hollow point bullets. (RR 4, 33). There were numerous weapons in the house. (RR 4, 34). Specifically, the deputies collected four handguns and five rifles. (RR 4, 44).

**An ambulance is dispatched.**

**Nathalia Monroy** was an advanced emergency medical technician for Acadian Ambulance.[5] (RR 4, 70-71). She was dispatched to Shady Meadows with her partner, Jose Moreno. She drove the ambulance and Mr. Moreno was in the back. (RR 4, 72). Because the area was not secured, she parked the ambulance some distance from the scene. (RR 4, 72). The police brought Mr. Siller to the ambulance on a backboard. (RR 4, 76). Mr. Siller was in distress. (RR 4, 77). He had two gunshot wounds to the left arm, one to the left shoulder blade, and one to the lower back. He also had an abrasion on his left arm. (RR 4, 78). He complained of pain in the right abdomen, but there were no visible injuries there. (RR 4, 79). They brought Mr. Siller to the trauma center at University Hospital. (RR 4, 80). This was deemed to be a critical injury, and it was important to get Mr. Siller to the emergency room within an hour after the injury. (RR 4, 81). The ambulance technician administered pain medication during the trip. They transferred Mr. Siller to hospital staff at the emergency room. (RR 4, 83).

**Mr. Denbina is arrested on a train in Fort Worth.**

**Jimmy Ferguson** was a Fort Worth police officer, assigned to the Fugitive Apprehension Unit. On May 1, 2014, he became aware that Sidney R. Denbina

---

[5] Ms. Monroy's testimony came after that of Fort Worth police officer Jimmy Ferguson at the trial. However, it is being summarized here to give the narrative a logical flow.

might be in the Fort Worth area. (RR 4, 59). Mr. Denbina was on a train headed through Fort Worth and was the subject of an arrest warrant. Officer Ferguson went to the train station and learned that the train was scheduled to arrive at 2:00 P.M. He was one of seven officers on the team. (RR 4, 60). The officers were in plain clothes, but wore vests with the word "Police" on them. (RR 4, 61). The officers knew where Mr. Denbina was on the train, and they had a photograph of him. When they got on the train, the officers approached Mr. Denbina and arrested him without incident. Mr. Denbina was not ticketed to get off the train at Fort Worth. (RR 4, 62). Mr. Denbina was not carrying any weapons. (RR 4, 63). He did not appear to be injured. (RR 4, 64).

**The complainant testifies.**

**Uvaldo Siller** resided at 10323 Shady Meadows in 2014. (RR 4, 87). He resided there with his mother. (RR 4, 90). Sidney R. Denbina lived across from him, but they were not friends. Mr. Denbina apparently lived alone. (RR 3, 91). Mr. Siller was employed as a mechanic. On April 30, 2014, he worked until 6:00 P.M. (RR 3, 92). After work, he went home, left and went to church, went to his girlfriend's house, and went home for the evening at about 9:50 P.M. (RR 4, 93-94). Mr. Siller was backing his truck into his driveway. He saw Mr. Denbina across the street. Mr. Denbina's hands were on his Jeep, and he was looking toward Mr. Siller. Mr. Siller saw a bright light. (RR4, 94). Mr. Denbina dropped

10

down. (RR 4, 96). The light was very bright, and it appeared to come from a flashlight. The light illuminated the ground. Mr. Siller saw Mr. Denbina come back up, and Mr. Denbina was wearing ear protection. (RR 4, 97).

Mr. Siller got out of his truck. He felt an impact on his back. He did not hear anything, but his body went numb. He fell to his left. (RR 4, 98). When he got to the ground, Mr. Siller saw Mr. Denbina holding a gun and shooting at him. (RR 4, 99). He fell into his yard, beside his truck. He was scared. He did not realize he had been shot until he saw Mr. Denbina continue to shoot at him. By then, Mr. Denbina was standing on the sidewalk on Mr. Siller's side of the street. (RR 4, 100). Mr. Denbina was holding a handgun in both hands. Mr. Siller did not know how many times Mr. Denbina fired. Two of the bullets struck Mr. Siller's truck. (RR 4, 101).

Mr. Siller said nothing to Mr. Denbina, and Mr. Denbina said nothing to him. After he was on the ground, he felt an additional bullet strike his arm. He could see that he was bleeding. (RR 4, 102). Mr. Siller's neighbor Rick Hernandez came to his aid, and he told Rick to look after his mother. (RR 4, 102-103). He also told Rick that he had been shot by Mr. Denbina, and pointed in the direction of Mr. Denbina's house. (RR 4, 103). The police arrived, but Mr. Siller's memory was not too clear about what happened, although he recalled someone saying, "Take cover." (RR 4, 104). Mr. Siller did not recall being in pain. The ambulance took him to University Hospital, where he remained for a week. He had a nerve graft

11

and intestinal reconstruction surgery. (RR 4, 105). By the time of the trial, Mr. Siller had about 80% use of his hand. (RR 4, 108). He had lifetime numbness in his right leg, because a nerve was surgically removed from the leg and transplanted in his hand. (RR 4, 111).

Mr. Siller did not communicate with Mr. Denbina in any way. He did not have a weapon on him or in his truck. (RR 4, 111). He did not threaten Mr. Denbina earlier that day, or that week. (RR 4, 111-112). He could not think of any reason for Mr. Denbina to shoot him. He did not threaten Mr. Denbina or any person that Mr. Denbina might feel he had to defend. The shooting was not an accident, because Mr. Denbina was aiming directly at Mr. Siller. (RR 4, 112).

**The forensic testimony.**

**Reymundo Chapa** was a BCSO deputy assigned to the Crime Scenes Unit. (RR 4, 128). He assisted Calvin Anderson in evidence collection, (RR 4, 129). Among other things, he collected four handguns at the scene. (RR 4, 132; RR 7, SX72, SX74, SX79 & SX80). **Tammy Sligh** was a firearms and tool mark examiner at the Bexar County Crime Lab. (RR 4, 136). One of the handguns she received from BCSO was a Heckler & Koch .45 caliber gun with holster and five magazines. (RR 4, 139; RR 7, SX72). She also received eight shell casings collected at the scene. (RR 4, 140; RR 7, SX70). Ms. Sligh test fired SX72 and did

a comparison. She concluded that the shell casings were fired by the weapon in question. (RR 4, 144).

**Mr. Denbina testifies.**

**Sidney R. Denbina** waived his Fifth Amendment rights, and testified on his own behalf. He had resided at the Shady Meadows address since 2006. (RR 4, 149) He was in the Army from 1994 until 2005. He was an ammunition sergeant, and became a collector of firearms. (RR 4, 150). Until this incident, Mr. Debina was a corrections officer at the Dominguez State Jail in San Antonio, and had worked there for five years. (RR 4, 152). Mr. Denbina did not become friendly with his neighbors on Shady Meadows. He was married when he purchased his house, but got a divorce in 2011 or 2012. (RR 4, 153). At the time of the incident, he worked the night shift, from 9:00 P.M. until 6:00 A.M. (RR 4, 153-154). He was not feeling well on April 30, 2014, and did not go to work. He had high cholesterol and suffered from chest pains. He was in and out of his house that evening, going out to smoke and to test his new satellite headphones. (RR 4, 154).

The headphones were made for aircraft ground crews and featured speakers and LED lights on the front and back. Mr. Denbina had recently received a couple of magazines for his weapons, and he was testing the fit of the belt that held the magazines. That is why he had his weapon with him, which was holstered

underneath his shirt.[6] (RR 4, 155). He was not in his TDCJ uniform. When Mr. Siller pulled up, Mr. Denbina was leaning on his Jeep listening to music. He went to his porch, about 20 feet from the Jeep, and he noticed that Mr. Siller was heading toward the passenger door of his Jeep. (RR 4, 156). Mr. Siller then backed away, and Mr. Denbina went to the Jeep and saw that Mr. Siller had "keyed" it, making a key mark under the Jeep's door lock, Mr. Denbina walked toward Mr. Siller, who had returned to his own truck. He was going to talk to Mr. Siller, but Mr. Siller pulled out a small gun and shot Mr. Denbina in the head. He was hit above the sideburns on the left side of his head. (RR 4, 157).

There was a small entrance wound. The bullet did not exit, and it was still embedded at the time of the trial. Mr. Denbina did seek treatment at the San Antonio Military Medical Center.[7] (RR 4, 158). He was told that the only option was surgical. He agreed to a follow-up meeting, but did not make the meeting, due to his legal problems. After Mr. Siller shot Mr. Denbina, Mr. Denbina drew his own weapon. He turned on the laser light on his gun, and returned fire twice. Mr. Denbina then approached Mr. Siller and fired a couple of additional shots. After that, Mr. Denbina went into his house. (RR 4, 159). He was in shock. He closed the door and looked out the window, where he saw Mr. Hernandez rendering aid to

---

[6] Mr. Denbina had a concealed handgun permit. (RR 4, 166).
[7] This happened later, after Mr. Denbina was released on bond. (RR 4, 205-206).

14

Mr. Siller. He was afraid that the situation would escalate, so he went out the back of his house and left the area via the greenway. He also feared the reaction of law enforcement, and was concerned about his medical issues. (RR 4, 160).

Mr. Denbina walked to a nearby gas station, went into the restroom, and looked at his wound. He knew he needed legal counsel. He thought about his brother, who was an attorney living in suburban Dallas. He took a taxi to the train station, and boarded a train to Dallas. (RR 4, 161). The train stopped in Fort Worth on the way to Dallas. When he was in custody in Fort Worth, Mr. Denbina did not have the chance to speak to his brother. His step-father, who lived in the Dallas area, arranged for legal counsel, who met him at the Tarrant County Jail. (RR 4, 162). That attorney made it clear that he would not represent Mr. Denbina in San Antonio. Mr. Denbina cooperated fully with the officers who arrested him in Fort Worth. (RR 4, 163).

Mr. Debina did not fire on Mr. Siller until after Mr. Siller fired upon him. He was in fear for his life, which is why he returned fire. He used the minimal amount of force necessary to extricate himself from the situation. He shot in self-defense. (RR 4, 164).

On cross-examination, Mr. Denbina admitted that he intentionally used the firearm, and he admitted that it was a deadly weapon. (RR 4, 164-165). He had four magazines with him at the time, and he thought they were all fully loaded.

15

(RR 4, 166). He could not give a reason for Mr. Siller "keying" his Jeep. He did not say anything to Mr. Siller. (RR 4, 175). Mr. Siller shot him with either Derringer or a small revolver. He did not see a shell casing ejected from Mr. Siller's gun. (RR 4, 177). Mr. Denbina started bleeding, but not profusely. (RR 4, 178). His own weapon had a sighted laser light attachment. (RR 4, 179). It happened so quickly that Mr. Denbina was not aiming at any particular part of Mr. Siller's body. It was more of a "shoot-from-the-hip" type shot. The holster was on his left side. (RR 4, 180).

Mr. Siller's weapon was a .22 caliber, which was probably not going to kill Mr. Denbina.[8] (RR 4, 185). Mr. Denbina did not recall firing eight times, but did not dispute the fact that eight shell casings were found. (RR 4, 186). He did not remember shots striking Mr. Siller's vehicle. He did recall Mr. Siller yelling out in pain. (RR 4, 187). Mr. Denbina left the scene to de-escalate the situation. He did not call 9-1-1 because he heard Rene Hernandez doing so. Mr. Denbina did not want to be there when the police arrived. The case was being carried as an active shooter situation, and he could have been killed. (RR 4, 189). He did not want to answer questions from law enforcement until he had legal representation. (RR 4, 190).

---

[8] The State's suggested inference that a .22 caliber firearm is not very deadly was disingenuous, to say the least. A .22 caliber handgun is a firearm, and is a deadly weapon *per se*. TEX. PENAL CODE § 1.07(a)(17)(A) (West 2011).

**The conviction, punishment phase, and post-conviction proceedings.**

Following the close of evidence and argument of counsel, the jury convicted Mr. Denbina of aggravated assault with a deadly weapon. (CR, 83; RR 5, 17). Mr. Denbina elected that the court assess punishment in case of conviction. (CR, 70). The case was reset for a pre-sentence investigation and was convened on May 4, 2015, for a punishment hearing. (RR 6, 1). Nothing in that hearing is relevant to the issue presented in this appeal. The trial court sentenced Mr. Denbina to a term of 15 years' confinement, with no fine. (CR, 104-105; RR 6, 31). The trial court certified that this not a plea bargained case and that Mr. Denbina has the right to appeal. (CR, 106). Mr. Denbina timely filed notice of appeal. (CR, 103). The trial court appointed the Bexar County Public Defender's Office to represent Mr. Denbina on appeal. (CR, 107). This appeal follows.

## Summary of the Argument

At trial, Mr. Denbina raised the justification defense of self-defense. By finding him guilty of aggravated assault with a deadly weapon, the jury implicitly rejected this defense. Once evidence raising the issue of self-defense has been presented, the State has the burden to prove beyond a reasonable doubt that the defendant's actions were not justified. The appellate court must view all the evidence in a light most favorable to the State, and determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and would also have found against the appellant on the justification issues. In this case, no rational trier of fact would have found against Mr. Denbina on the issue of self-defense. He is therefore entitled to a reversal and a judgment of acquittal.

## Argument

## Appellant's Point of Error (Restated)

The evidence was legally insufficient to support the jury's implicit rejection of Sidney R. Denbina's claim that he acted in self-defense.

A challenge to the legal sufficiency of the evidence need not be preserved at trial, and may be raised for the first time on appeal. *Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001). Mr. Denbina testified that he felt that his life was in jeopardy on the night in question, and that he shot at Mr. Siller in self-defense. (RR 4, 164). Accordingly, the jury charge contained a self-defense instruction. (CR, 76-78). The jury implicitly rejected that defense when it convicted Mr. Denbina of aggravated assault with a deadly weapon. (CR, 83; RR 5, 17).

**Self-defense and legal sufficiency: the general principles.**

TEX. PENAL CODE § 9.31(a) (West 2011) provides:

A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. The use of force against another is not justified in response to verbal provocation alone.

A person is justified in using deadly force against another if he would be justified in using force, as defined above, and when and to the degree he reasonably believes that the deadly force is immediately necessary to protect him against the other person's use or attempted uses of unlawful deadly force. TEX. PENAL CODE §§ 9.32(a)(1) & (a)(2) (West 2011). If the actor has the right to be

19

present at the location where deadly force is used, did not provoke the other person, and was not involved in criminal activity at the time, he is not required to retreat before using deadly force. TEX. PENAL CODE § 9.32(c) (West 2011).

Legal sufficiency of the evidence "is an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia,* 443 U.S. 307, 316 (1979). The standard of review is whether, when viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.* at 319; *Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010). The appellate court will consider all evidence admitted, whether proper or improper. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

Once evidence raising the issue of self-defense has been presented, the State has the burden to prove beyond a reasonable doubt that the defendant's actions were not justified. TEX. PENAL CODE § 2.03(d) (West 2011). This is a burden of persuasion rather than a burden of production. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Consequently, where legal sufficiency is raised on appeal in the context of an assertion of self-defense, the reviewing court does not

look to whether the State presented evidence which refutes the appellant's self-defense testimony. Rather, the court must determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the charged offense beyond a reasonable doubt and would also have found against the appellant on the self-defense issue, also beyond a reasonable doubt. *Id.* at 914. "A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.*; *Miranda v. State*, 350 S.W.3d 141, 147 (Tex. App. – San Antonio 2011, no pet.).

"The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. [Citation omitted]. Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The trier of fact is free to believe or disbelieve the testimony of any witness. *Flanagan v. State*, 675 S.W.2d 734, 746 (Tex. Crim. App. 1984) (op. on reh'g). Likewise, the jury determines the weight to be afforded contradicting testimony. *Brooks*, 323 S.W.3d at 899; *Stogiera v. State*, 191 S.W.3d 194, 196 (Tex. App. – San Antonio 2005, no pet.).

**Application.**

Mr. Denbina had a concealed weapon permit. (RR 4, 166). Therefore, he was legally carrying his weapon. He had the right to be where he was, first in his

own yard and then in the street in front of his house. He was not violating any laws. Thus, he had no duty to retreat.

Admittedly, the evidence clearly showed that Mr. Denbina was not very neighborly. The neighbors did not really know him because he kept to himself. (RR 3, 33). He did not attempt to get to know them. (RR 4, 153). It is not a stretch to say that Mr. Denbina was something of an expert on weapons. He spent 11 years of his life in the United States Army, becoming an ammunition sergeant. He collected firearms. (RR 4, 150). In civilian life, he worked as a correctional officer for the Texas Department of Criminal Justice, first at the Torres Unit in Hondo, and later at the Fabian Dominguez State Jail in San Antonio. (RR 4, 151-152). The State of Texas thus trusted him to legally carry weapons to keep order in the presence of some of the State's most dangerous residents. It is fair to say that, until this incident, Sidney R. Denbina was an exemplary citizen and public servant. It is also fair to say that he must have passed some rather rigorous background checks in order to get where he was.[9]

**Mr. Denbina's evidence of self-defense was not refuted beyond a reasonable doubt by the State.**

There is ample evidence to support the conclusion that Mr. Denbina acted in self-defense. He was in his own yard, smoking a cigarette and testing a set of

---

[9] For the eligibility criteria to be a TDCJ corrections officer, *see* http://www.tdcj.texas.gov/divisions/hr/coinfo/emp-co.html (last accessed on October 8, 2015).

headphones. (RR 4, 154). Mr. Siller initiated the exchange, not Mr. Denbina. Mr. Siller came home that evening. For some unexplained reason, Mr. Siller came across the street and vandalized Mr. Denbina's Jeep. Mr. Denbina went over to talk with Mr. Siller about it, and Mr. Siller pulled out a weapon of his own and shot, striking Mr. Denbina in the head and, very luckily, not seriously injuring him. (RR 4, 157). Of course, Mr. Debina did not know how seriously – or not – he was wounded at the time. Even the State's witness, Rene Hernandez, agreed that the first shot he heard was followed by a short pause, and then came a series of additional shots. (RR 3, 46). This lends credence to Mr. Denbina's testimony that Mr. Siller shot him first, and that he returned fire. It obviously took him a few moments to react.

The use of force by Mr. Denbina was completely justified under these circumstances, because Mr. Siller's act of vandalism, followed and escalated by his shooting at Mr. Denbina, indicated his imminent use of force against Appellant. TEX. PENAL CODE § 9.31(a) (West 2011). The use of deadly force was justified, and under these circumstances was immediately necessary to defend against Mr. Siller's immediately previous use of deadly force against Mr. Denbina. TEX. PENAL CODE §§ 9.32(a)(1) & (2)(a)(West 2005).   Mr. Denbina had no way of knowing whether Mr. Siller would shoot him again. Therefore he believed that the use of deadly force by Mr. Siller was imminent, and such a belief at that moment "would

23

be held by an ordinary and prudent man in the same circumstances." TEX. PENAL CODE § 1.07(a)(42) (West 2011).

Mr. Siller began the encounter, and was not provoked by Mr. Denbina. The State failed in its burden of persuasion to prove beyond a reasonable doubt that Mr. Denbina's actions were not justified. No rational trier of fact would have found for the State that the essential elements of murder were proved beyond a reasonable doubt, and against the Appellant on the issue of self-defense beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d at 914. The evidence in this case was therefore legally insufficient.

**Harm analysis.**

Legal sufficiency of the evidence invokes constitutional issues. *Gollihar v. State*, 46 S.W.3d 243, 245-46 (Tex. Crim. App. 2001). If the record reveals constitutional error that is subject to harmless error review, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a) (West 2014). The error complained of here contributed to Mr. Denbina's conviction. Indeed, Mr. Denbina could not have been convicted, but for the error. "[T]he remedy for a finding of legally insufficient evidence on appeal is acquittal." *Gollihar v. State*, 46 S.W.3d at 246. Therefore,

the judgment of conviction should be reversed, and a judgment of acquittal should be rendered.

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, the Appellant prays the Court of Appeals to uphold the point of error, reverse the judgment of conviction and render an order of acquittal.

Respectfully submitted,

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender
Paul Elizondo Tower
101 W. Nueva St., Suite 370
San Antonio, Texas 78205
(210) 335-0701
FAX (210) 335-0707
mrobbins@bexar.org
Bar No. 16984600
ATTORNEY FOR APPELLANT

## Word Count Certificate of Compliance

Pursuant to TEX. R. APP. P. 9.4(i)(1) & (i)(2)(B) (West 2015), the word count, from the beginning of the Statement of Facts until, but excluding, the signature block, is 5,670. The total word count is 7,016. The Appellate Public Defender's Office uses Microsoft Word 2010.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Brief For Appellant has emailed to the Bexar County District Attorney's Office, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205, on October 9, 2015.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender